# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **JOHN DOE**, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: RWT 10cv2646 |
| | * | |
| **ROBERT L. WALKER**, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM OPINION

> "The political franchise of voting . . . is regarded as a fundamental
> right, because preservative of all rights."

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

It is axiomatic that a state may not erect obstacles which deprive a group of citizens of the fundamental right to vote absent sufficient justification. *Louisiana v. United States*, 380 U.S. 145 (1965). This case requires the Court to determine whether preliminary injunctive relief should be granted to the Plaintiffs on their claim that the manner in which Maryland is conducting absentee voting for state offices in the November 2, 2010 election deprives absent uniformed services and overseas voters of their fundamental right to vote. As explained below, the Court concludes that it does, and, by separate order, a preliminary injunction will be entered.

The Plaintiffs, a member of the Maryland National Guard stationed in Iraq, and the Military Voter Protection Project ("MVPP"), filed a Complaint alleging that the failure of the state of Maryland to timely provide absentee ballots to absent uniformed services and overseas voters deprives them of the right to vote in violation of the First and Fourteenth Amendments, the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. § 1973ff, *et seq.* and Maryland law. They seek a preliminary injunction ordering the state to

extend by ten days the deadline by which such ballots must be received to be deemed valid. ECF No. 1 ¶¶ 6-7.

The Court concludes that Plaintiffs' claims under UOCAVA must be dismissed as moot, and their claims under Maryland law and the Equal Protection Clause of the Fourteenth Amendment must be dismissed. However, because Plaintiffs have made a substantial showing that Maryland will severely burden absent uniformed services and overseas voters' ability to vote for candidates for state offices if the deadline for receipt of their absentee ballots is not extended, and the state's asserted interests in enforcing the present deadline do not justify such a burden, this Court will order narrowly tailored preliminary injunctive relief.

## I.    BACKGROUND

On November 2, 2010, Maryland voters will cast ballots to elect candidates to multiple state and federal offices, including United States Senator, members of the United States House of Representatives, Governor of Maryland, and members of the Maryland legislature. The provision of absentee ballots to overseas citizens, including members of the United States military, is governed in part by the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), as amended by the Military and Overseas Voter Empowerment Act ("MOVE Act") and in part by the Maryland Election Code and regulations promulgated by the Maryland State Board of Elections ("State Board").

### A.  The MOVE Act, UOCAVA, and the Maryland Election Code

In 2009, Congress passed the Military and Overseas Voter Empowerment Act ("MOVE Act"), which amended the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. § 1973ff, *et seq.* Pub. L. No. 111-84 §§ 577 to 582, 583(a), 584 to

587, 123 Stat. 2190 (2009). The MOVE Act was enacted in response to the widespread disenfranchisement of absent uniformed services and overseas voters during the November 2008 general elections. An estimated six million military and overseas civilian voters have the right to cast absentee ballots in federal elections. No Time To Vote: Challenges Facing America's Overseas Military Voters, THE PEW CENTER ON THE STATES, January 2009, at 1, *available at* http://www.pewcenteronthestates.org/uploadedFiles/NTTV_Report_Web.pdf. The Congressional Research Service found that in the 2008 elections, "two out of every five military and overseas voters, 39 percent—who requested an absentee ballot in 2008 received it from local election officials in the second half of October or later—much too late for a ballot to be voted and mailed back in time to be counted on election day." 156 CONG. REC. S4513-02 (daily ed. May 27, 2010) (statement of Sen. Schumer).

UOCAVA, as amended by the MOVE Act, required the states to implement certain reforms prior to the November 2010 general elections to prevent this disenfranchisement of absent uniformed services and overseas voters.[1] In particular, states are now required to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election" so long as the absentee ballot request was received at least 45 days before the election. 42 U.S.C. § 1973ff-1(a)(8). UOCAVA also requires states to allow overseas and absent uniformed services voters to request voter

---

[1] An "absent uniformed services voter" is "(A) a member of a uniformed service on active duty who, by reason of such active duty, is absent from the place of residence where the member is otherwise qualified to vote; (B) a member of the merchant marine who, by reason of service in the merchant marine, is absent from the place of residence where the member is otherwise qualified to vote; and (C) a spouse or dependent of a member referred to in subparagraph (A) or (B) who, by reason of the active duty or service of the member, is absent from the place of residence where the spouse or dependent is otherwise qualified to vote." 42 U.S.C. § 1973ff-6(1).

An "overseas voter" is (A) an absent uniformed services voter who, by reason of active duty or service is absent from the United States on the date of the election involved; (B) a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States; or (C) a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." *Id.* § 1973ff-6(5).

registration materials and absentee ballot applications by electronic means. 42 U.S.C. § 1973ff-1(e). Under UOCAVA, a state can apply for a one-time waiver of the 45-day transmittal requirement if the state demonstrates that complying with the requirement would cause it undue hardship as described in the statute. 42 U.S.C. § 1973ff-1(g). UOCAVA's requirements apply only to absentee ballots used to elect candidates for federal office. *Id.* § 1973ff-1(a)(1).

The provision of absentee ballots used to elect candidates for Maryland state offices is governed by the Maryland Election Code and administrative regulations promulgated by the Maryland State Board of Elections. Maryland allows any registered voter, including absent uniformed services and overseas voters, to vote by absentee ballot. MD. CODE ANN., ELEC. LAW § 9-304. Under Maryland law, there is no requirement that absentee ballots be transmitted to voters 45 days prior to an election, or any specific length of time in advance of when they are due. To count as validly cast, absentee ballots from Maryland voters must be mailed to the local election board on or before the date on which the election is held, and must be received by the local board office on or before 10 a.m. on the second Friday after a general election. MD. CODE REGS. 33.11.03.08B. In order to have their votes counted as validly cast in the November 2, 2010 election, absentee voters will therefore have to mail their ballots by November 2, 2010, and those ballots will have to be received by the voter's local election board by November 12, 2010. Absentee ballots must contain proof that they were mailed on or before the date of the election either in the form of a postmark or a voter's affidavit attesting to that fact. MD. CODE REGS. 33.11.03.08B. Absentee ballots not timely received are not counted. MD. CODE REGS. 33.11.03.08C.

## B. FACTS AND PROCEDURAL HISTORY

Plaintiff Officer John Doe[2] is a member of the Maryland National Guard who is currently on active duty in the United States Army. ECF No. 1 ¶ 5. Officer Doe, a registered voter in the state of Maryland, is stationed in Iraq, and requested an absentee ballot so that he could vote in the November 2, 2010 elections. *Id.* Plaintiff Doe requested an absentee ballot in August, and is concerned that he will not be able to receive, fill out, and return his ballot before the November 12, 2010 deadline for receipt of absentee ballots. *Id.*, Tr. Oral Argument at 24:12-21. Plaintiff Military Voter Protection Project ("MVPP") is a non-profit organization which seeks to protect the voting rights of military personnel. ECF No. 1 ¶ 6. MVPP asserts claims on behalf of its members who are registered Maryland voters stationed abroad with the military, who have requested absentee ballots so that they may vote in the upcoming election. *Id.* ¶¶ 6-7. Defendants Robert Walker, Bobbie Mack, Rachel McGuckian, David McManus, Jr., Charles Thomann, and Linda Lamone are officials of the Maryland State Board of Elections ("State Board"). The State Board is responsible for managing and supervising elections and ensuring Maryland elections comply with Maryland and federal law. MD. CODE ANN., ELEC. LAW § 2-102(a).

On July 28, 2010, Defendant Linda Lamone, Administrator of Elections for the Maryland Board of Elections, submitted a waiver application on behalf of the state of Maryland as permitted under UOCAVA. ECF No. 9-1 at 5. However, Lamone withdrew the waiver request on August 25, 2010, indicating that the state intended to comply with the 45-day transmittal requirement imposed by UOCAVA. ECF No. 1 Ex. A. The letter indicated that the state would

---

[2] Officer Doe is proceeding under a pseudonym in order to protect his military mission. ECF No. 2.

comply with UOCAVA by mailing ballots containing only the names of candidates for federal office, namely candidates for the United States Senate and the United States House of Representatives for the voter's district ("federal-only" ballots) on September 18th and then sending state ballots separately once they had been certified. *Id.* The letter indicated that overseas absentee "voters will be instructed that the federal ballot will only be counted if the state ballot is not voted and returned to the appropriate local board of elections." *Id.* The withdrawal of the waiver request was seriously questioned by the Montgomery County Board of Elections. ECF No. 1 Ex. B.

On September 14, 2010, Maryland held its primary elections. On September 18, 2010, Maryland election officials mailed approximately 10,400 "federal-only" absentee ballots to absent uniformed services and overseas voters. ECF No. 6-1 at 3, ECF No. 9-1 at 6. These ballots did not contain the names of candidates for Maryland state elective offices. Due to canvassing and vote verification requirements imposed by the Maryland Election Code, the State Board did not certify statewide primary election results until September 27, 2010. ECF No. 6-1 at 9.

On September 23, 2010, Plaintiffs Officer Doe and the MVPP filed a four count complaint in this Court alleging that the manner in which the Maryland Board of Elections was conducting absentee voting for the November 2, 2010 federal and state elections violated the Uniformed and Overseas Absentee Voting Act of 1986 ("UOCAVA"), the Maryland Election Code, and rights guaranteed by the First and Fourteenth Amendments. ECF No. 1. The complaint included a prayer for injunctive relief which requested, in part, an order requiring the State Board to accept as validly cast all ballots received from absent uniformed services and

overseas voters on or before November 22, 2010, and requiring the state to count all ballots received from these voters by November 22nd before certifying the results of the election.[3] ECF No. 1 at 15, ECF No. 9-1 at 9.

On October 8, 2010, local election boards began sending "state ballots"—ballots containing candidates for both Maryland state and federal offices—to absent uniformed services and overseas voters. ECF No. 6-1 at 16. On October 9, 2010, Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF No. 6. This Court ordered expedited briefing on the merits of the motion to dismiss and on the merits of ordering preliminary injunctive relief as requested in the Complaint. ECF No. 7. On October 18, 2010, Plaintiffs filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction, with an accompanying memorandum in support of their motion and in opposition to the Defendants' Motion to Dismiss. ECF No. 9. Defendants filed an opposition to Plaintiffs' request for injunctive relief and a reply in support of their Motion to Dismiss on October 21, 2010. ECF No. 14. This Court heard oral argument on October 22, 2010.

## II.    STANDING

For the first time in their Opposition to Plaintiffs' motion for injunctive relief, Defendants argue that Plaintiffs may lack standing. ECF No. 14 at 18. Defendants note that, despite Doe's claim that he requested an absentee ballot in August, the Montgomery County Board of Elections, Plaintiff Doe's local board of elections, has not received an absentee ballot application

---

[3] The complaint included further requests for injunctive relief that were later abandoned by Plaintiffs. For example, Plaintiffs initially requested an order requiring the State Board to accept as validly cast ballots cast by absent uniformed services voters and overseas voters that were postmarked after November 2, 2010. ECF No. 1 at 15.

from Officer Doe.[4]  Tr. Oral Arg. 10-12.  If Officer Doe did not request an absentee ballot before September 18th, Defendants reason, he lacks standing because he has no injury of which to complain.  ECF No.14 at 19.  Defendants argue that, if Officer Doe lacks standing, Plaintiff MVPP may lack organizational standing.  *Id.*

Counsel for both parties agreed to reserve arguments on Officer Doe's standing until a later date; therefore, for the purposes of Plaintiffs' motion for preliminary injunctive relief and Defendants' Motion to Dismiss, Defendants have waived their argument that Plaintiffs lack standing.  Tr. Oral Arg. 11:7-25, 12:1-24.  However, "[t]he federal courts are under an independent obligation to examine their own jurisdiction."  *United States v. Hays*, 515 U.S. 737, 742 (1995) (internal quotation marks, brackets, and citation omitted).  Because the Court is satisfied that MVPP has organizational or associational standing, there is no cause to dismiss this complaint on standing grounds at this time.

An organization has representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.  *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977)).

MVPP asserts in the complaint that it has many members who are registered Maryland voters who are actively deployed overseas, who would therefore have standing to sue Defendants for violations of their right to vote.  ECF No. 1 ¶¶ 6-7.  MVPP also states that its mission is to

---

[4] Defendants are aware of Officer Doe's real identity.

protect the voting rights of active duty military personnel, and challenging an allegedly unconstitutional deprivation of absent uniformed services and overseas voters' right to vote is clearly germane to that purpose. Finally, the Court sees no reason why the claims asserted or the relief sought would require the participation of individual members of MVPP in this action. Therefore, the Court is satisfied that MVPP has organizational standing to assert claims on behalf of its members.

## III. STANDARDS OF REVIEW

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Summary Judgment

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court of the United States explained that in considering a motion for summary

judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

### C. Preliminary Injunction

Plaintiffs seek preliminary injunctive relief in this case. ECF No. 1 at 15. The party seeking preliminary injunctive relief must demonstrate by a "clear showing" that: (1) he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374-376 (2008); *Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F. 3d 342 (4th Cir. 2009).

### IV.    ANALYSIS

### A.  UOCAVA CLAIMS

Defendants argue that they complied with the requirements of UOCAVA by transmitting "federal-only" ballots, containing the names of candidates for the United States Senate and the United States House of Representatives to all registered, Maryland absent uniformed services and overseas voters on September 18, 2010, exactly 45 days prior to the November 2nd election. ECF No. 9-1 at 7-12. Therefore, Defendants argue, Count I of Plaintiffs' complaint, which

alleges violations of UOCAVA and the MOVE Act, must be dismissed. *Id.* Both in their memorandum in support of their motion for injunctive relief and at oral argument Plaintiffs conceded that their claim under UOCAVA should be dismissed as moot. ECF No. 9-1 at 1, Tr. Oral Arg. at 9:19-24. Because Defendants transmitted ballots containing the candidates for federal office to absent uniformed services and overseas voters covered by UOCAVA 45 days prior to the November 2, 2010 elections for federal office, Count I of Plaintiffs complaint shall be dismissed as moot.

### B. VIOLATIONS OF MARYLAND LAW

Defendants argue that they are entitled to dismissal of Count II of Plaintiffs' complaint, which alleges that the September 18, 2010 transmission of "federal-only" ballots violated Maryland state law. ECF No. 6-1 at 14-17.

The Maryland Election Code prescribes that "[t]he content of both an absentee ballot and a provisional ballot issued to a voter shall be identical to the ballot used in the polling place of the voter's residence." MD. CODE, ELECTION LAW § 9-213. The ballot must contain the name "of each candidate who has been certified by the [State] Board [of Elections]." *Id.* § 9-205. Maryland law prohibits a person from using, distributing, possessing, printing, or reproducing "a ballot other than as authorized in this article." *Id.* § 9-217. Plaintiffs' complaint alleged that:

> "The State Board clearly violated Maryland state law by creating a ["federal-only"] absentee ballot that does not contain certified candidates and which has not been certified by the State Board. It further violated state law by not creating an absentee ballot that is identical to the ballot being used in polling places on Election Day. Finally, the State Board unlawfully distributed these defective ballots to numerous military voters on or about September 18, 2010."

Any state law that conflicts with the mandatory provisions of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) is preempted and invalid. U.S. CONST. art. 6, cl. 2; *see also Bush v. Hillsborough County Canvassing Bd.*, 123 F. Supp. 2d 1305, 1314 (N.D. Fla. 2000). Defendants argue that in any gubernatorial election year, it is impossible to comply with both the 45-day transmittal requirement of UOCAVA and the Maryland Election Code. ECF No. 6-1 at 9. This is because under the Maryland Election Code after the primary election is held, MD. CODE ANN., ELEC. LAW § 8-202(a)(2)(i), an absentee ballot canvas must be conducted two days later, MD. CODE REGS. § 33.11.04.03A, and the absentee ballot canvass must be followed six days later by a provisional ballot canvass. *Id.* 33.16.04.03A. A second absentee ballot canvass must be conducted eight days following the primary election, *Id.* 33.11.03.08B(2), 33.11.04.03A(2), after which the vote count must be verified, MD. CODE ANN., ELEC. LAW § 11-308(a). Only after these steps are completed can the election be certified by local boards of elections and transmitted to the State Board. This year, this series of statutory requirements was not completed until September 27, 36 days before the general election. ECF No. 6-1 at 9. Therefore, compliance with both UOCAVA and the provisions of the Maryland Election Code and the Maryland Code of Regulations was impossible, at least in 2010. Because mandatory provisions of the UOCAVA preempt Maryland state law, Count II of Plaintiffs Complaint must be dismissed.

## C. VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

Count IV of Plaintiffs' Complaint alleged that the manner in which the State Board is conducting the November 2, 2010 elections imposes "severe burdens on military voters' right to vote . . . especially when compared to other voters" and that this "disparate treatment constitutes

a violation . . . under the Equal Protection Clause, in that it does not provide military voters with the same right to vote enjoyed by other voters." ECF No. 1 ¶¶ 71-72. Defendants argue that Count IV of Plaintiffs' complaint must be dismissed because there is no violation of rights protected by the Equal Protection Clause absent proof of discriminatory intent, and Plaintiffs cannot prove that the November 12, 2010 deadline for receipt of absentee ballots reflects an intent to discriminate against absent uniformed services and overseas voters. ECF No. 6-1 at 22.

Plaintiffs stated at oral argument that they are conceding that their equal protection claims should be dismissed at this time. Tr. Oral Arg. at 9:12-18. Therefore, Count IV of Plaintiffs' complaint shall be dismissed.

### D. VIOLATIONS OF THE FUNDAMENTAL RIGHT TO VOTE

Plaintiffs now premise their request for preliminary injunctive relief solely upon Defendants' alleged violations of absent uniformed services and overseas voters' fundamental right to vote. Plaintiffs argue that Defendants' enforcement of the November 12, 2010 deadline for receipt of absentee ballots unconstitutionally burdens absent uniformed services and overseas voters' rights to vote for candidates for *state* office. To determine if preliminary injunctive relief is appropriate, the Court must first assess Plaintiffs' likelihood of succeeding on the merits of their claim that Defendants have burdened their fundamental right to vote.

#### 1. The Fundamental Right to Vote and the *Anderson* Standard

It is beyond dispute that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1976).

Though a state may regulate how elections are conducted to ensure that they are orderly, fair, and honest, a state's right to regulate elections is not absolute. *Storer v. Frommhagen*, 415 U.S. 724, 729-730 (1974). All election laws impose some burden on the right to vote; however, whether the burden imposed by a given law is constitutional depends on the specific state interests that law seeks to protect. *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983).

In determining whether a state's election law is constitutional:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

If a plaintiff's right to vote is severely burdened by enforcement of the state's law, the law is only constitutional if it is "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal quotations and citations omitted), *see also Greidinger v. Davis*, 988 F.2d 1344, 1352 (4th Cir. 1993) ("If a substantial burden [on plaintiff's right to vote] exists . . . the restrictions on the right to vote must serve a compelling state interest and be narrowly tailored to serve that state interest.") By contrast, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*

### 2. The Burden Placed on Absent Uniformed Services and Overseas Voters by the November 12th Deadline

Though at first glance the November 12, 2010 deadline for receipt of absentee ballots under Code of Maryland Regulations Section 33.11.03.08B appears to impose only a modest burden on absent uniformed services and overseas voters, upon closer inspection, the severe burden imposed by the regulation becomes apparent.

Undisputed testimony indicates that Maryland's local boards of election only *began* sending out "state ballots"—ballots containing the candidates for state office, along with the candidates for federal office—on October 8, 2010. ECF No. 6-1 at 3, Tr. Oral Arg. 5:15-25. At oral argument, Defendants' counsel stated his belief that absentee ballots were mailed to absent uniformed services and overseas voters by October 9, 2010 at the latest. Tr. Oral Arg. 18-20. Some ballots were mailed directly by local boards to absent uniformed services and overseas voters, but others were mailed by the local boards to R.R. Donnelley, a contractor, which then mailed those ballots to absent uniformed services and overseas voters using United States Postal Service ("USPS") Priority Mail or International Priority Mail. ECF No. 6-2 ¶ 16. Apparently, the state ballots sent by the local election boards on October 8th or 9th were also sent by "expedited delivery." Tr. Oral Arg. 20:2-8.

October 9, 2010 was a Saturday prior to the federal Columbus Day holiday, celebrated on October 11, 2010. At most, therefore, absent uniformed services and overseas voters were given 35 days (from October 8, 2010 to November 12, 2010) in which to receive, fill out, and return their ballots to their local boards of election in order to have their ballots deemed validly cast. Given that at least some of these ballots were mailed on the Saturday prior to the Columbus Day holiday, and some were mailed to a third-party contractor prior to being mailed abroad, it is

likely that many were actually postmarked on Tuesday, October 12th, 21 days before the election and 31 days before absent uniformed services and overseas voters were required to return their ballots in order for them to be counted.

The Department of Defense states that the Army's wartime standard for first class mail delivery is 12 to 18 days from its point of origin in the United States to the individual service member.[5]  A report by the Government Accountability Office ("GAO") concluded that while the exact transit time of international mail delivery to military members abroad could not be determined, delivery times to soldiers serving in Iraq generally met the 12 to 18 day standard.[6] The GAO concluded that the Department of Defense's estimate that a letter or parcel sent to a military member in Iraq was delivered within 11 to 14 days after it was mailed significantly understated the actual transit time required.[7]   The Department of Defense's Federal Voting Assistance Project has concluded that international mail sent to overseas military members requires at least 30 days or more for round-trip processing, and the FVAP recommends states allow 45 days for round-trip processing of military mail to individuals stationed overseas.  *See United States v. Cunningham*, 2009 U.S. Dist. LEXIS 98010, at *3-4 (E.D. Va., Oct. 15, 2009).

The Army indicates that even USPS Priority Mail requires 12-18 days to travel from its point of origin in the United States to active duty military personnel stationed abroad.[8]   The

---

[5] Army Field Manual 12-6, Chapter 6, Doctrinal Requirements and Standards of Support" *available at* http://www.globalsecurity.org/military/library/policy/army/fm/12-6/Ch6.htm#top

[6] Neal P. Curtin, OPERATION IRAQI FREEDOM: Long-standing Problems Hampering Mail Delivery Need to Be Resolved, GAO Report 04-484 (Washington, D.C.: Government Accountability Office, Defense Capabilities and Management, April 14, 2004) p. 9, *available at* http://www.gao.gov/new.items/d04484.pdf.

[7] *Id.*

[8] Army Field Manual 12-6, Chapter 6, Doctrinal Requirements and Standards of Support" *available at* http://www.globalsecurity.org/military/library/policy/army/fm/12-6/Ch6.htm#top

Army will not deliver Priority Mail faster than other mail if to do so would result in "[d]egradation of processing of other mail."[9]

This election, the United States Postal Service has made available a new shipping label called Express Mail Label 11-DOD, which is intended to expedite the return of absentee ballots from absent uniformed services and overseas voters to their local election boards.[10] There is no reliable data available regarding the transit time of ballots which use this label.[11]

Defendants argue that their use of USPS Priority Mail and the availability of the 11-DOD label relieves absent uniformed services and overseas voters of the burden imposed by the November 12, 2010 deadline. ECF No. 14 at 8-9. Defendants reason that absent uniformed services and overseas voters will therefore be able to return their state ballots before the November 12, 2010 deadline. *Id.* at 9. The Army indicates that even Priority Mail requires 12-18 days to travel one way from the United States to a military member stationed abroad in wartime.[12] Further, this is the first election in which the Express Mail Label 11-DOD is being used and the Court has before it no evidence regarding the transit time of a ballot sent using this

---

 ("Processing mail based on its priority is situational dependent. Postal elements at all levels should process mail, build pallets, and load and unload trucks in a manner allowing priority/first class mail to be processed from point of origin to customer in 12 to 18 days. Degradation of processing of all other mail is not appropriate if it occurs only to move priority/first class faster than 12-18 days.")

[9] *Id.*

[10] United States Postal Service APO/FPO Ballot Procedures, *available at* http://www.usps.com/electionmail/ballot.htm

[11] *Id.*

[12] Army Field Manual 12-6, Chapter 6, Doctrinal Requirements and Standards of Support" *available at* http://www.globalsecurity.org/military/library/policy/army/fm/12-6/Ch6.htm#top

label.[13]  Where there is no concrete evidence indicating that the use of Priority Mail and the 11-DOD label will decrease the 12 to 18 day one-way delivery time the Army indicates is reasonable, the Court deems it prudent to use the 12 to 18 day benchmark in assessing the burden imposed by the November 12th deadline.[14]

Given that international mail to military personnel can take 36 days for round-trip processing, and some absentee ballots for state office sent to these individuals were not likely postmarked until October 12, 2010, even the most diligent absent uniformed services or overseas voter might be unable to return his ballot by November 12th.  Assuming his state ballot was postmarked on October 12th and the voter received it 18 days later, on October 30th, and that he filled it out and posted it the next day, the voter's ballot still might not arrive at his local election board until November 18th.  This example demonstrates the difficulty an absent uniformed services or overseas voter would face in meeting the deadline imposed by Code of Maryland Regulations Section 33.11.03.08B.  Further, this calculation makes no accommodation for unexpected delays in processing, the time after delivery to an individual's military post before that individual actually receives his mail (for example, if he is away from base on an assigned mission), or the time necessary for a voter to research candidates.

Though the State Board's willingness to provide electronic access to absentee ballots will aid some military personnel in voting and returning their ballots prior to the November 12th

---

[13]    United States Postal Service APO/FPO Ballot Procedures, *available at* http://www.usps.com/electionmail/ballot.htm

[14] This Court may take judicial notice of matters of public record from sources—such as the United States Army and the Government Accountability Office—whose accuracy cannot be reasonably questioned. Fed. R. Evidence 201(b); *see also Hall v. Virginia,* 385 F.3d 421, 424 n. 3 (4th Cir.Va.2004); *Colonial Penn Ins. Co. v. Coil,* 887 F.2d 1236, 1239-40 (4th Cir.1989).  This Court thus takes judicial notice of the fact that the United States Army and the Government Accountability Office have concluded that international military mail requires between 12 and 18 days to be delivered to an overseas military member during wartime.

deadle, it will not aid those who lack access to the internet.[15]  Voters also may be hesitant to cast ballots through electronic and internet voting as these methods "are more vulnerable to privacy and security compromises than the conventional methods" of voting by paper ballot.  No Time to Vote: Challenges Facing America's Overseas Military Voters, THE PEW CENTER ON THE STATES, January 2009, at 16, *available at* http://www.pewcenteronthestates.org/uploadedFiles/NTTV_Report_Web.pdf.  Maryland's use of an electronic voting option therefore does not fully mitigate the burden imposed by the late mailing of paper absentee ballots to absent uniformed services and overseas voters.

Further, unlike domestic absentee voters who may request an absentee ballot because it is inconvenient or difficult for them to vote at a polling station, military personnel deployed overseas lack the ability to vote in person.  Voting by absentee ballot provides these men and women with their only meaningful opportunity to vote in state and federal elections while they are deployed abroad.  By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.

---

[15] Similarly, Defendants contend that the State Board's unofficial policy of accepting the Federal Write-in Ballot ("FWAB") for state and local elections demonstrates that the November 12th deadline does not impose a severe burden on absent uniformed services and overseas voters attempting to vote in state elections.  ECF No. 6-1 at 21. However, this "policy" is not contained in either the Maryland Election Code or any regulation promulgated by the State Board.  Rather the State Board's policy of accepting the FWAB as a substitute for official state ballots is contained only in the Federal Voting Assistance Program's 2010-2011 Voting Assistance Guide.  ECF No. 6-2 at 5. This Guide and the policies contained therein do not carry the force of state law or regulation.  As such, the State Board is not bound by them, and absent uniformed services and overseas voters could reasonably be wary that if they use the FWAB, their ballot may be considered invalid.  Further, the FWAB has significant limitations, most notably that it does not list the candidates who are running for each office.  Therefore, if an overseas voter lacks access to the internet or some other source of election information, he may not know (1) which races are presently being contested and (2) the full slate of candidates running for each office.

### 3. The State's Interest in Adhering to the November 12th Deadline

Having determined that enforcement of the November 12, 2010 deadline for receipt of absentee ballots severely burdens Plaintiffs' right to vote, the Court must next consider the precise interests the state has in enforcing the November 12th deadline for receipt of absent uniformed services and overseas voters' ballots.

Defendants argue that "the statutorily prescribed sequence of elections preparations . . . are essential to the order and integrity of the election" and that enforcement of the November 12th deadline is necessary to protect the "values of finality and certainty." ECF No. 14 at 11. However, Defendants do not indicate how the order, certainty or finality of the election will be undermined by extending the deadline for receipt of ballots from absent uniformed services and overseas voters by ten days.

Defendants argue that any extension of the deadline will upset the state's statutory scheme for certifying elections. *Id.* at 12. They note that the deadline for receipt of absentee ballots is the same day as the statutory deadlines for verifying the vote count, certifying the election, and transmitting results to the State Board, the Governor, and the clerks of the circuit courts. *Id.* at 12. However, Defendants' counsel conceded at oral argument that if this Court were to order the deadline for receipt of absentee ballots be extended, all the aforementioned statutory deadlines would automatically be pushed back in accordance with the new deadline. Tr. Oral Arg. 14-15.[16]

---

[16] At oral argument, the Defendants argued that granting preliminary injunctive relief to protect absent uniformed services and overseas voters' fundamental right to vote will invite complaint from other voters who have not timely received absentee ballots. Tr. Oral Arg. 30-31. Such a "slippery slope" argument is unpersuasive. The Court will not deny First Amendment protection to absent uniformed services and overseas voters solely on the grounds that other individuals may then be inspired to assert their constitutional rights. Further, there is no evidence before this court that domestic absentee voters were "severely burdened" by the deadline at issue, and there is therefore no

The interest in ensuring final, fair, and orderly elections is clearly an important state interest. However, where Defendants have not articulated a single, specific injury that would result from extending the deadline for receipt of ballots from absent uniformed services and overseas voters by ten days, the state has failed to articulate a "precise interest" in enforcing the law at issue, as required under *Anderson* and *Burdick*.

### 4. On Balance, the Right of Absent Uniformed Services and Overseas Voters to Have Their Ballots Counted Outweighs the State's Interest in Enforcing the November 12, 2010 Deadline

Maryland's local boards of election mailed absentee "state ballots" to absent uniformed services and overseas voters between October 8th and October 9th. As noted, *supra*, it is likely that at least some of those ballots were not postmarked until October 12th. Thus absent uniformed services and overseas voters had between 31 and 35 days to receive, fill out, and return their ballots in order to have those ballots deemed valid and counted. MD. CODE REGS. 33.11.03.08B. In light of the Army's estimate that it takes between 12 and 18 days for mail to travel one-way from the United States to a military voter stationed abroad, the Court concludes that enforcement of the November 12th deadline for receipt of these state ballots imposes a severe burden on absent uniformed services and overseas voters' fundamental right to participate in Maryland's election of state officers. Further, where the state has failed to articulate any precise, compelling interest in enforcing that deadline, the state law, as applied to absent uniformed services and overseas voters, is unconstitutional.

Contrary to Defendants' contention at oral argument, the Supreme Court has previously held that a deadline imposed by a state election law imposed an unconstitutional burden on

---

reason to believe other civil actions will be inspired by the Court's conclusion that absent uniformed services and overseas voters have been deprived of their right to vote. The Court will not speculate on facts not before it.

voters' fundamental right to vote. Tr. Oral Arg. 25. In *Anderson v. Celebrezze*, the Supreme Court held an Ohio statute requiring an independent candidate for President to file both a statement of candidacy and a nominating petition in March in order to appear on the general election ballot in November was unconstitutional. *Anderson*, 460 U.S. at 791. The Court noted that the March deadline could substantially burden independent-minded voters and candidates because the deadline would thwart the possibility of "a newly-emergent independent candidate [that] could serve as a focal point for a grouping of Ohio voters who decide, after mid-March, that they are dissatisfied with the choices within the two major parties. *Id.* at 791. The Court acknowledged that the state had a legitimate interest in fostering informed voting and political stability, but concluded that the March deadline did not further those interests. *Id.* at 798. In fact, the Court concluded, the deadline actually deprived the Ohio electorate of a greater understanding of election issues by limiting the access of independent candidates to the ballot. *Id.* As in *Anderson*, Maryland's seemingly innocuous deadline actually imposes a substantial burden on a group of voters. Where enforcement of that deadline is not necessary to further a compelling state interest, it unconstitutionally infringes the right to vote.

The Court's holding is a narrow one. Given Defendants' mailing of state ballots to absent uniformed services and overseas voters between 31 and 35 days before they had to be returned in order to be deemed validly cast, enforcement of the November 12, 2010 deadline for receipt of absentee ballots from these voters unconstitutionally infringes their fundamental right to vote.

The Court does not hold that there is any fundamental right to vote by absentee ballot. *See McDonald v. Bd. of Election Commissioners*, 394 U.S. 802, 807 (1969). Rather, it reaches the unremarkable conclusion that where a state has authorized the use of absentee ballots, any

22

restriction it imposes on the use of those absentee ballots which has the effect of severely burdening a group of voters must be narrowly tailored to further a compelling state interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), s*ee also Price v. New York State Bd. of Elections*, 540 F. 3d 101 (2d Cir. 2008).

The state has not articulated a "precise interest" that is served by accepting absentee ballots received from through November 12, 2010, but refusing to accept as validly cast those ballots received from November 13, 2010 through November 22, 2010. The state fails to articulate how the order or integrity of the elections will be undermined by a ten day extension of the deadline for receipt of absentee ballots. Defendants have not argued that such an extension will lead to increased voter fraud. In any event, there is no reason to believe that voter fraud will increase because Maryland will still deem invalid any ballot that was not mailed on or before November 2nd, as evidenced by either a postmark or sworn voter affidavit. MD. CODE REGS. 33.11.03.08B. Defendants' counsel also acknowledged at oral argument that the orderly administration of Maryland's government would not be disrupted by the extension, because Maryland law allows current officials to hold over past their current terms until their successors are sworn in. Tr. Oral Arg. 29-30.

Therefore, after balancing the asserted state interests against the severe burden placed on Plaintiffs' right to vote, the Court concludes that the November 12, 2010 deadline for receipt of absentee ballots from absent uniformed services and overseas voters cannot constitutionally be enforced.

### E. Plaintiff's Have Made A Showing Sufficient to Support the Issuance of a Preliminary Injunction.

Because Plaintiffs' interests in having their votes counted outweighs the interests put forward by Defendants in support of enforcing the November 12, 2010 deadline, the Court concludes that Plaintiff's are likely to succeed on the merits of their fundamental right to vote claim at trial. Further, a narrowly tailored order is necessary to prevent irreparable harm to Plaintiffs. In the absence of an order from this Court, Defendants will likely certify the results of the elections for state office without counting the "late-arriving" votes of absent uniformed services and overseas voters. Once state election results are certified, a court would be understandably reluctant to require the state to count Plaintiffs' votes, because to do so would disrupt the state's interest in assuring the finality of the election results. Therefore, Plaintiffs will be irreparably deprived of their right to participate in electing candidates running for Maryland state offices this election cycle if this Court does not issue a preliminary injunction.

Further, the balance of equities tips in Plaintiffs' favor. Absent uniformed services and overseas voters who are stationed abroad have no means of voting for Maryland state candidates *but* by absentee ballot. Their use of absentee ballots is not a matter of convenience; rather, they lack the liberty necessary to vote in person in the state of Maryland. The right to vote has long been recognized as a fundamental political right, preservative of all other rights, and men and women stationed overseas should not be deprived of this fundamental right where the state can point to no compelling interest that would be served by doing so. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Those in a foreign theater of war in the service of their country deserve nothing less than to be accorded fundamental constitutional rights.

Finally, the public interest is served by extending the November 12th deadline by ten days.  Our form of representative democracy is premised on the concept that every individual is entitled to vote on equal terms, and each individual's vote carries the same value as every other vote.  *Baker v. Carr*, 369 U.S. 186 (1962).  Extending the deadline will allow absent uniformed services and overseas voters the same opportunity to have their votes counted as is afforded other Maryland voters.  The composition of Maryland's government will therefore represent the will of all of its citizens, not just those who are able to vote in Maryland.

Though the Court is reluctant to interfere with Maryland's election machinery, where the risk of disenfranchisement of a group of voters is as great as it is in this case, narrowly tailored injunctive relief is warranted.  A separate order follows.


October 29, 2010                        _____/s/_____
Date                                    Roger W. Titus
                                        United States District Judge